The following opinion of the Court was prepared by
Dade, .T.
In coming to a decision upon this delicate and important question, the Court has considered it to be its duty to ascertain, not what may be expedient, or morally, or politically right in relation to this matter, but what is the law. It is its duty to expound and declare the actual law; and not to make, or amend it. We have not been unaware that, in regard to misdemeanors, very extensive powers have been sometimes attributed to the Court of King’s Bench in England, as the cusios morum of the realm; and *679 that the same are supposed to appertain to the General and Circuit Courts, as holding the same place, in respect to this Commonwealth. But, although both these tribunals have, upon the same principles, long exercised a control over offences contra bonos mores, we think it is apparent that neither has ever arrogated to itself, in the exercise of these powers, the latitude of jurisdiction, which some have supposed to belong to them, but which could not be exercised without an alarming encroachment upon the liberty of the subject or citizen. It is more just, as well as more safe, to consider this power as limited by the instances, which, in the process of ages, have from time to time occurred, and are upon record, than to regard it as a new principle applicable to every case, which, in the opinion of every Judge, may seem to be comprehended within it. This doctrine would erect a power truly inquisitorial: a power to be exercised, not within the limits of a long line of established precedents, but to be deduced according to the ever-varying opinions of its depositaries, from a course of reasoning upon a subject admitting as much diversity of opinion, as much subtlety and refinement, as any other-whatsoever; the influence of the deportment of each member of society upon the general welfare of the whole.
This latitudinous doctrine we disclaim. Nor is it the first time that this Court has, in effect, made this disclaimer. The cases of The Commonwealth v. Isaacks, November Term, 1826, ante, 634; and Anderson v. The Commonwealth, ante, 627, at the same Term, rest for their decision mainly on the same principles. The first of these cases, was an Indictment against a man and woman for living for many years in a state of concubinage; but, without charging a specific act of fornication. The Indictment was at common law, and not under the statute. The second, was the case of abduction and seduction of a young female, (above the age of sixteen,) under such circumstances of atrocity, that the jury amerced him in $ 1,000, and the Court superadded a *680 confinement of two years and six months. In the General Court, it was attempted to maintain these prosecutions upon the ground, that the acts were contra bonos mores. But, this idea was repelled by the Judges, and the jurisdiction was disclaimed.
It is said to be the boast of the common law, that it continually conforms itself to the ever-changing condition of society. But, this conformity keeps on pari passu with those changes. Like them it is slow and imperceptible: so that society may easily conform itself to the law. When great changes take place in the social order, a stronger hand, that of the Legislature, must be applied. Thus, when slavery, a wholly new condition, was introduced, the common law could not operate on it. The rules were to be established, either by the positive enactments of the lawmaking power, or to be deduced from the Codes of other countries, where that condition of man was tolerated. If we can derive no aid from these sources, it will not do to appeal to maxims and principles of the common law, applicable to quite different subjects. When the Courts recognize the power to punish one who should take his slave into the market place, and there violently beat him, it is not because it was a slave who was beaten, nor because the act was unprovoked or cruel; but, because ipso facto it disturbed the harmony of society; was offensive to public decency, and directly tended to a breach of the peace. The same would be the law, if a horse had been so beaten. And yet it would not be pretended, that it was in respect \to the rights of the horse, or the feelings of humanity, that |this interposition would take place.
To descend from these preliminary principles to the case in hand, it seems reasonable to suppose, that when slavery was introduced into the then English Colony of Virginia, without reference to the common law of England, which had never acknowledged it, (for villenage is not the prototype of slavery, as it has always existed here,) *681 without the positive enactments of the Parliament of the Mother Country, or of the Colonial Legislature, but. at the mere will of the buyers and sellers, the condition of the slave was that of uncontrolled and unlimited subjection to the will of the master: or, it was to be modified by the established usages of those countries, where to a great extent it still prevailed, or of those extinct nations, where it had existed, and had been subjected to well-settled and established rules; the customs of the former were but little known to a people with whom, from the influence of polk tical and religious prejudices, they had scarcely any intercourse. But, amongst the ancients, slavery had been tolerated by the Theocratic Jews, and the polished nations of Greece and Rome. The Bible furnished to every man evidences of its existence and rules amongst the ancient Jews: History gave brief notices of its institutions amongst the ancient Greeks: but, the ample body of the Roman civil law furnished the most abundant information touching the institutions, customs, rules and enactments, in regard to this condition of man. From these sources, then, were probably derived the few and vague rules, by which the unconditional subjection of the slave to the will of the master, may be presumed to have been modified in the first stages of the existence of slavery in this Colony, and until it became the subject of positive legislative enactment.
Amongst the Jews, slavery was traced to the paternal curse of Noah upon the descendants of his grandson Canaan. Genesis, (chap. 9, ver. 25.) The records of their laws respecting slaves are few and meagre, and are principally to be found in Exodus, chap. 21. They constitute a marked difference in the rights of slaves and freemen in the most important of all, life itself. For, while the punishment of death is repeatedly denounced against the slayer of a freeman, or even many Inferior injuries done to him; such as attempting his life by guile, (ver. 14,) stealing a freeman and selling him, or even having him in hand to sell, (ver. 16,) &(;. &c„, yet, the death of a slave by whipping unde?’ *682 the hand of the master, was merely punishable,* (ver. 20;) an(j jj. s]ave survived.a .day or two, the master was in no wise punishable, (ver. 21.) Maiming a slave (ver 26, seems to have been followed by a consequence rather ¡tended to relieve the slave, than to punish the master; i. e. his freedom.
Amongst the ancient Greeks, slavery prevailed to a great extent in every of the States, from the earliest to the latest period of their history. Yet, we have no important de« tails concerning any of them, except the Spartan Helots. These, according to Thucydides, Isocrates and others, were the descendants of Greeks, chiefly Messenians, taken in war. It is notorious, that their condition was supremely miserable. It is of little consequence to speak of their rights, when we advert to the institution of the Cryptia or Jlm.huscade, attributed by Plutarch to Lycxirgus; (see Pint, in vita Lycurgus) according to which, in order to reduce the formidable numbers of the Helots, the young Spartans were occasionally sent out to slaughter all the men they could lay their hands on.
The great extent and vast power of the Roman Republic and Empire, her higher advancement in the arts of government and jurisprudence, and the ample records of her civil institutions, embodied and preserved to us in the civil law, furnish more abundant materials from thence than from any of the ancient nations. As subjects of property, of police, and of government, their books are in no respect deficient. Here, as in Greece and even Judea, (for it can be but little doubted, that the curse of Noah was used to justify the Jews in the slavery which arms had enabled them to impose on the people of the promised land,) slavery is to be traced to captivity in war. The uncontrolled power of the captor over the life of his captive, might be readily *683 understood to imply every inferior power. Accordingly, we find the Roman law bottomed upon this principle. Key to the Civil Law, 177, title “Slave;” Justinian's Inst. Book 1, title 3, § 3; Vattel, Book 3, ch. 8, § 152, &c.
We have before said, that slavery in this country was not derived from villenage. This was of purely feudal origin, and was never exercised in .England, as slavery was amongst the ancients, and still is here. Arid yet, in many respects, its condition was very similar. Strictly, it was a tenure, whereby the inferior held lands of his superior. Co. Litt. title Villenage, sec. 172. Anri it. was In this relation, that the subject is generally treated by the old law-writers. It is remarkable, that, of the true condition of the pure, villein in gross? we have only an imperfect account, and are at fault in many important particulars. Bracton, indeed, Lib. 4, fob 208, thus defines it: “ Pwnim tsiUenagium est a quo praestatur servitium ineertum et indeterminatum: ubi scire non potest vespers, quah- servitium fieri debet mana, viz, ubi quis jacaré tenetur. quicquid eipreceptum jiteritJ’ This would seem to define slavery; yet, we know not, whether the villein in gross was liable to unconditional sale by his Lord; whether he was subject to the writs of execution against chattels; nor whether, on the death of the Lord, he passed to the heir or executor, though it is more probable that they were regarded as real property. But, we know that they differed from our slaves in these important particulars. They might purchase some kinds of property which did not enure to the Lord, and even against him have aa appeal of the death of the father. Litt. sec. 189. A villein might be an executor, and as such, sue his Lord. Ib. see. 191-2. He might become a Monk, and was thenceforth free. lb. sec. 202. And a wife became free by marrying a freeman. Ib. But that, in respect to this order of men, which is most pertinent to our present purpose, is, that the Lord might be indicted for maiming his villein. Idtt, sec. 194. And the remarkable roasoa Is *684 given by Coke, 127, a, that the villein is a subject of the j£¡ng. (^at vita et membra sunt in manu regis, “and so the Lord of the villein, for the cause aforesaid, cannot maim the villein, but the King shall punish him for maimjrjg hjs subject.” This reasoning excludes the idea, that in punishing the Lord for even maiming, the rights of the villeit), the cause of humanity, or the good order and manners or morals of society, were at all regarded. Lit tie-ton, by enumerating maiming as the offence, for which the Lord was punishable, excludes the pretence of his being liable for a less offence: and Coke’s reason, together with the old legal definition of Mayhem, shews that the true ground was, that the villein was, by the maiming, less serviceable to the King in his wars.
We, therefore, consider that the deductions from the laws of villenage are adverse to this prosecution: and we are left to enquire, what countenance it receives from the statutory law’ of our own land. As to this, it is not pretended that there is, or ever was, an act of the Legislature, either of the Colony or State of Virginia, made for the punishment of this offence. But, on the contrary, a just inference from our statutes in regard to slaves, furnishes an argument against the exercise of the powers, of late only, ascribed to the Courts. They are said to have been introduced into the Colony in the year 1620, and they do not appear to have been the objects of legislation, or of more than slight incidental notice in our laws, until nearly fifty years thereafter, (viz: in 1669,) when the first act of Assembly concerning injuries done to slaves, was passed, (2 Stat. at Lar. 270,) excusing the master from all punishment for killing his slave under correction for resistance.
In 1723, (4 Stat. at Lar. 132,) this act was extended to correction for any offence whatever; and owners killing their slaves, were not only dispunishable in case the homicide amounted to only manslaughter, but even in some cases, where at the common law, the crime would have mounted up to the degree of murder. This was re-enacted *685 m 1748, (6 Stat. at Lar. 111,) in very nearly the same words, and was not repealed until 1788, (12 Stat. at Large, 681.)
The passage of these, exculpatory acts, proves that slaves were not wholly without the protection of the law. As with the Jews, the Romans, arid the villeins of England, their lives were guarded, and it is probable that these ancient laws and usages were the principal authority for it. But, after the passage of the act of 1669, and until the year 17K8, there certainly could'have been no pretence for maintaining such prosecutions as these. He who by statute had been declared not in any wise punishable for even homicide, ensuing from the correction of his slave, could not be regarded as amenable to the laws for any inferior degree of correction. Since 1788, the life of the slave is protected by the laws equally with that of the freeman. And the siatutcs for punishing maiming extend as well to the protection of the bond as the free, from this high and aggravated degree of personal injury. But, without any proofs that the common law did ever proteet the slave against minor injuries from the hand of the master, with the positive assurance that, if ever the common law extended so far, it was, for more than a century, and up to a comparatively late period, nullified by the existence of statutes entirely inconsistent with it, where are we to look for the source of the power which is now claimed for us r Not in the statute book certainly; not in a species of common law growing out of usage since 1788. The time itself would be scarce long enough to give any usage within its limits, title to be enrolled in that venerable Code: but, no such usage has been cited; on the contrary, these prosecutions, with two or others springing up about the same time, the validity of which was always contested, and has never been settled, seem to be a new idea. The only remaining pretext would be the ductile and flexible character of the common law, which moulds itself to the «.hanging condition, of human society. But. we have ah *686 ready repelled the deductions sought, to be drawn from source: great changes are not to be made by the Courts. It is only silent, and almost imperceptible changes, which are recognized, and in due time, confirmed, and established the judicial tribunals.
It is greatly to be deplored that an offence so odious and revolting as this, should exist to the reproach of humanity. Whether it may be wiser to correct it by legislative enactments, or/leave it to the tribunal of public opinion, which will not fail to award to the offenders its deep and solemn reprobation, is a question of great delicacy and doubt. This Court has little hesitation in saying that the power of correction does not belong to it: and, with but one dissenting voice, it declares, that it has not jurisdiction over this of-fence, and that the demurrer to the Indictment must be sustained.*

 Probably by pecuniary mulct, “as the Judges should determine,” as provided in the case mentioned in the 22c? verse, where nearly the same language is used.

 ./Vale.—The opinion in this case was made up so late in the term in which the judgment was rendered, that there was not time during that Court to do justice to the reasons upon which it was founded. It was, therefore, injoined upon Dade, J. to prepare the written opinion by the ensuing Court, when, if approved by the other Judges, it was to he spread on their book of opinions. Circumstances rendered it expedient that this case should be published with others, before the term, at which it had been proposed to submit the opinion to be prepared by Dade, J. to Iris colleagues. Accordingly, he was written to for the opinion, and forwarded it as requested: but, as he did not feel himself justified in being instrumental in its going before the public, as the opinion of the other Judges, who concurred in the judgment, without their approbation, he required, that (if used at all,) it should be published, either as his own opinion alone, or if as that of the Court, (for which it was prepared, and whose arguments it embodies, as well as recollected) with an explanatory note, which would free them from responsibility for the particular course of the argument